*NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :
JOHN BRANDT,                        :
                                    :
                 Plaintiff,         :
                                    :          Case No. 10-4944(FLW)(DEA)
            v.                      :
                                    :
ELIZABETH HOGAN, et al.,            :          **OPINION**
                                    :
                 Defendants.        :
_____    :

**WOLFSON, United States District Judge:**

Plaintiff John Brandt, pro se, a civilly-committed mental patient confined in New Jersey, brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. Defendants Elizabeth Hogan, Patricia Foundas, Benito Marty, Reed Gladey, John Main, Jennifer Velez, and Susikala Pasupuleti ("Defendants") filed the instant motion for summary judgment, and Plaintiff filed a cross-motion for partial summary judgment. Also pending before the Court is Plaintiff's application for the appointment of pro bono counsel. For the reasons that follow, the Court denies both parties' motions for summary judgment and grants Plaintiff's application for appointment of pro bono counsel.

## I. BACKGROUND

The following factual allegations are taken from Plaintiff's First Amended Complaint ("FAC") and are undisputed unless otherwise noted.

In 2001, Plaintiff was charged, in two indictments, with burglary, criminal mischief, and criminal trespass. He was subsequently diagnosed with bipolar disorder, manic type with psychotic features, and with an antisocial personality disorder. In 2003, the trial judge found him

competent to stand trial on both indictments and not guilty by reason of insanity.  Thereafter, he was involuntarily committed and placed on Krol status.[1]  He remains committed and on Krol status following required periodic reviews.  FAC, ¶ 4.[2]

Plaintiff's claims in the FAC arise from his placement in Ann Klein Forensic Center ("AKFC") beginning on March 6, 2010.[3]  Plaintiff alleges that he was transferred to AKFC on March 6, 2010, from the less restrictive setting of Trenton Psychiatric Hospital ("TPH"),[4] FAC, ¶ 15, and was placed under the supervision of Defendants Benito Maury, Patricia Foundas, Reed Gladey, Susikala Pasupuleti, and Elizabeth Hogan (the "treatment team").[5]  Id. at ¶ 16.  While at AKFC, Plaintiff alleges that he (1) receives constitutionally inadequate treatment, and (2) is

---

[1]      See State v. Krol, 68 N.J. 236 (1975) (detailing periodic review procedures for persons found not guilty by reason of insanity and committed for mental health treatment); N.J.S.A. 2C:4–8(b)(3) ("If the court finds that the defendant cannot be released with or without supervision or conditions without posing a danger to the community or to himself, it shall commit the defendant to a mental health facility approved for this purpose by the Commissioner of Human Services to be treated as a person civilly committed.").

[2]      This Court recently discussed Plaintiff's Krol status and commitment history in more detail in Brandt v. Feibusch, No 10-4223, 2012 WL 1937563, at *1 (D.N.J. May 29, 2012).

[3]      Subsequent to the filing of the FAC, Plaintiff was transferred from AKFC to Greystone Park Psychiatric Hospital ("GPPH") on or around October 5, 2011, from GPPH back to AKFC on or around January 20, 2012, back to GPPH on or around September 5, 2012, and back to his current placement in AKFC on or around February 2, 2013.  See Dkt. Nos. 11, 25, 33, 41.

Plaintiff has not filed an amended complaint in light of these transfers, and Defendants have not filed anything with the Court stating or suggesting that these transfers have mooted any of Plaintiff's claims.  Given the nature of Plaintiff's claims, which seek both past and prospective relief, the Court assumes for the purposes of these motions that the conduct Plaintiff complains of in the FAC has continued whenever he has been transferred back into AKFC, including through the present.

[4]      Plaintiff alleges he was transferred to AKFC for "breaking some windows" at TPH. FAC, ¶ 15. Plaintiff further alleges that he was discharged from AKFC on July 22, 2010, sent to TPH, but was transferred back to AKFC that same day based on TPH administrators' claims that Plaintiff was not "ready" for discharge from AKFC's more restrictive setting.  See id. at ¶ 32.

[5]      Plaintiff also identifies Defendant John Main as the chief executive officer of AKFC, Defendant Jonathan Poag as the director of the Division of Mental Health Services, and Defendant Jennifer Velez as commissioner of the Department of Human Services.  FAC, ¶ 16. Defendant Poag, however, was never served, and is thus not a party to this case.  See Dkt. No. 28.

wrongfully isolated and confined to his room in violation of his state and federal rights.  Plaintiff, however, does not challenge his placement at AKFC or argue that he should be transferred to a less restrictive setting, such as TPH.[6]   Rather, the essence of Plaintiff's claims in the FAC concerns the nature of his treatment and confinement at AKFC.

With regard to treatment, Plaintiff alleges that the members of his treatment team fail to make a bona fide effort to provide treatment appropriate to his mental condition, preventing him from qualifying for discharge from AKFC.  See Id. at ¶¶ 17-18.  Specifically, Plaintiff alleges that the treatment team: (1) inadequately communicates with Plaintiff; (2) performs only a perfunctory job, e.g., sees Plaintiff only once per week for less than a minute, and for less than six minutes a month; (3) provides Plaintiff with no adequate individually specialized treatment program; and (4) does not help Plaintiff implement his treatment plan.[7]   Id. at ¶¶ 19-21, 27.  Plaintiff further contends that none of the treatment programs provided to him are adequate for his mental condition in light of present medical and scientific knowledge.  Id. at ¶¶ 26, 28-29.  Additionally, Plaintiff alleges that he has suffered, and continues to suffer, "psychological" and "mental" anguish from his extended stay at AKFC and the lack of appropriate medical treatment.  Id. at ¶ 34.  In that connection, Plaintiff complains that the lack of adequate treatment renders his confinement punitive – like that of a penitentiary – instead of rehabilitative.  In sum, Plaintiff argues that the treatment he receives at AKFC is constitutionally inadequate because it is not the product of acceptable professional judgment.

---

[6]    Plaintiff also contends that he does not fit within the category of patients who have committed certain criminal offenses making them eligible for placement at AKFC; instead, he has been placed there based on his transfer from other, less restrictive, institutions because his behavior allegedly presented a substantial likelihood of threat to others.  See Pl. Mot. for Summary Judgment, Statement of Facts, ¶¶ 5-6.

[7]    Plaintiff also alleges that he is seen by members of the "rehab department," who are not members of his treatment team and who are not qualified to provide him adequate treatment.  FAC, ¶¶ 25-26.

With respect to his wrongful isolation claim, Plaintiff alleges that he lives under "inhumane conditions" at AKFC by virtue of being confined to his room – or, in his words, "jail cell"[8] – for the majority of the day and night.  Id. at ¶ 38; see also id. at ¶¶ 35, 37.  Specifically, Plaintiff alleges that he is let out of his room from 7:00am until 11:00am, from 12:30pm until 3:30pm, and from 5:30pm until 9:00pm.  Id. at ¶ 40; see also id. at ¶ 25 (describing his treatment plan as "first period class from 9:00am until 10:00am is gym; second period class from 10:00am until 11:00am is computer class; third period class from 1:30pm until 2:30pm is gym; and fourth period class from 2:30pm until 3:30pm is library").[9]  Plaintiff further alleges that when he is relegated to his room, he is locked in it.  Id. at ¶ 42.  Plaintiff contends that, although Defendants claim he is being confined because of his behavior and mental condition, id. at ¶¶ 45-46, no emergency or medical reason exists to justify such confinement.  Id. at ¶¶ 39, 45, 56.  In that connection, Plaintiff claims that his confinement is not founded on the relevant policies and procedures in place at AKFC.  Plaintiff lastly relies on his inadequate treatment claim as further evidence of his wrongful isolation.  Id. at ¶¶ 46-48.

Plaintiff seeks declaratory relief, monetary damages, and injunctive relief.[10]  Defendants have moved for summary judgment on both counts of the FAC.[11]  Plaintiff has also filed his own

---

[8]     In that regard, Plaintiff alleges that he has no private bathroom or privacy in his living quarters.  FAC, ¶ 41.

[9]     Plaintiff also alleges, however, that the members of the general population at AKFC are confined to their rooms under the same schedule.  Id. at ¶ 40.

[10]     Plaintiff brings his claims against Defendants in their individual capacities for damages, and in their official capacities for injunctive relief.  FAC, Intro.

[11]     Defendants argue that both Plaintiff's cross-motion for summary judgment and his opposition to Defendants' motion for summary judgment were untimely filed.  Plaintiff responds that he attempted to file his papers before their respective deadlines, and that any delay is the fault of the institution to which he is confined and/or the mail system.  Because Plaintiff's filings were each only several days late, and Defendants have not appeared to suffer any prejudice as a result of these delays, the Court exercises its discretion and considers the merits of Plaintiff's arguments.

4

cross-motion for partial summary judgment on the second count of the FAC – the wrongful isolation claim. Additionally, on March 13, 2013, Plaintiff filed an application for appointment of pro bono counsel pursuant to 28 U.S.C. § 1915(e)(1).[12] Defendants have not opposed Plaintiff's application for counsel.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 184 (3d Cir. 2010) (citing Fed. R. Civ. P. 56(c)); Meditz v. City of Newark, 658 F.3d 364, 369 (3d Cir. 2011) ("Summary judgment is appropriate 'where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'"). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added). "An issue of material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 545 (3d Cir. 2012); Anderson, 477 U.S. at 248. Thus, disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In considering the moving party's motion, a court must "construe[ ] facts and draw[ ] inferences in favor of the party against whom the motion under consideration is made." J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 925 (3d Cir. 2011) (en banc) (internal

---

[12]   Plaintiff had previously filed an application for appointment of pro bono counsel on July 2, 2012, which the Magistrate Judge denied on July 9, 2012.

quotation marks omitted); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Curley v. Klem</u>, 298 F.3d 271, 276-77 (3d Cir. 2002). "The initial burden is on the party seeking summary judgment to point to the evidence 'which it believes demonstrate[s] the absence of a genuine issue of material fact.'" <u>United States v. Donovan</u>, 661 F.3d 174, 185 (3d Cir. 2011) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When the moving party has carried its burden, the nonmoving party must 'set out specific facts showing a genuine issue for trial.'" <u>Betts v. New Castle Youth Dev. Ctr.</u>, 621 F.3d 249, 252 (3d Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2)).

Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57. "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." <u>Betts</u>, 621 F.3d at 252. Moreover, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" <u>Jakimas v. Hoffmann-La Roche, Inc.</u>, 485 F.3d 770, 777 (3d Cir. 2007) (quoting <u>Anderson</u>, 477 U.S. at 252). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex Corp.</u>, 477 U.S. at 322.

Finally, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. "The court may not . . . weigh the

evidence or make credibility determinations because these tasks are left for the fact finder."  Doe v. Luzerne Cnty., 660 F.3d 169, 175 (3d Cir. 2011) (internal quotation marks omitted).

### III. DISCUSSION

Plaintiff's claims are brought under 42 U.S.C. § 1983 for certain alleged violations of his constitutional rights.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

### A.  Freedom from Isolation and Restraint Claim

Plaintiff claims that he has been denied his right to be free from isolation and restraint. He does not challenge his civil commitment, per se, or his placement in AKFC.  Rather, Plaintiff's claim turns on whether AKFC's security policy, e.g., restricting patients to their rooms during portions of the day, including by locking patients in their rooms, violates Plaintiff's state and federal rights.  Specifically, Plaintiff claims that he has the right to be free from "physical restraint and isolation except in cases of emergency," see N.J.S.A. 30:4-24.2(d)(3), and the right to the "least restrictive conditions to achieve the purpose of treatment."  See N.J.S.A. 30:4-24.2(e)(2); see also FAC, ¶ 59.[13]  Plaintiff claims that these rights are violated when Defendants

---

[13]     As discussed in more detail infra, in addition to the substantive liberty interests of a committed individual that arise directly under the Fourteenth Amendment, see Youngberg v.

place Plaintiff in "lock down" in his room at AKFC during certain daytime hours and overnight. See FAC, ¶ 40; Pl. Mot. for Summary Judgment, 3.  Based on these allegations, Plaintiff argues that summary judgment in his favor is warranted because Defendants have not shown that there is any policy or other reason based on professional judgment, standards, or practices that constitutionally justifies locking Plaintiff in his room during these periods.[14]  See Pl. Mot. for Summary Judgment, 2-4; FAC, ¶ 60.   In opposing Plaintiff's cross-motion for summary judgment, and in support of their own motion, Defendants argue that Plaintiff's claim is barred by a release he executed in a prior action as part of a settlement agreement.  Defendants further argue that, notwithstanding the release, Plaintiff's claim is meritless.

Both parties rely on the policies and procedures in place at AKFC in support of their arguments, which are found in a document titled "AKFC Policy and Procedure."[15]  This document identifies certain AKFC objectives and purposes, including as follows:

- "The New Jersey Ann Klein Forensic Center . . . is the full security treatment setting for inpatient psychiatric services. . . . [I]t treats those mentally ill individuals who demonstrate behaviors that are injurious to themselves and/or others . . . ."

- "[W]hen mental illness is associated with an individual who has demonstrated an ability and willingness to engage in [violent crime or dangerously disruptive behavior] a highly structured secure and supervised

---

Romeo, 457 U.S. 307 (1982), other liberty interests may be created by state law.  See Hewitt v. Helms, 459 U.S. 460, 466 (1983); Asquith v. Department of Corrections, 186 F.3d 407, 409 (3d Cir. 1999); see also Scott v. Plante, 691 F.2d 634, 638 (3d Cir. 1982) (finding that New Jersey law provides a state right to reasonable care pursuant to N.J.S.A. 30:4–24.2(e)(1)).  Thus, it is through the rights granted under New Jersey law that Plaintiff brings his wrongful isolation claim.

[14]   Plaintiff also contends that Defendants have not shown any "budgetary constraints" justifying Plaintiff's confinement to his room.  Def. Br. in Support of Summary Judgment, 8. Plaintiff does not further develop this argument, which appears to be another facet of his claim that his confinement is not the result of a decision based on professional judgment.

[15]   The AKFC Policy and Procedure is attached to Defendant Main's certification submitted with Defendants' motion for summary judgment, and portions of it are also attached to Plaintiff's cross-motion for summary judgment.  Both sets of the document are identical.

> evaluative and treatment environment must be provided to enable an
> individual to refrain from serious physical injury to self or others."

Pl. Mot. for Summary Judgment, Ex. at AKFC 1.

Regarding individual confinement to rooms, Defendants point to the section of the AKFC Policy and Procedure that notes that AKFC "has established a system of accounting for all patients by a series of regular census counts . . . ." Pl. Mot. for Summary Judgment, Ex. at AKFC 3. These census counts include both written census counts and patient/room checks. Id. at AKFC 3-4. For written census counts, "all patients are to be in their rooms unless otherwise cleared;" with the stated purpose being to "count the total number of patients actually on the unit at the time of the count" and to "ensure the patient appears well and not in any distress." Id. at AKFC 3. Notably, these census counts are scheduled to occur during the times that Plaintiff complains he is unnecessarily confined to – and locked in – his room. For patient/room checks, which are "clinical in nature," the purpose is "to establish as best as possible that each patient appears well and not in any apparent distress and that the room itself appears safe and free of contraband, etc." Id. at AKFC 4. In that regard, the AKFC Policy and Procedure explains that the patient/room checks "are extremely important in detecting suicidal or self-destructive behavior, illness, escape attempts or sudden or significant change in ones medical/clinical condition." Id.

In addition, Defendant John Main certified, in his capacity as Chief Executive Officer of AKFC, the rationale for AKFC's security policies:

- "AKFC is a secured psychiatric facility containing a volatile and at times violent resident population. Thus, a highly structured secure and supervised evaluative and treatment environment must be provided to enable an individual to refrain from serious physical injury to self or others."

- "Because of the nature of [AKFC's] patient population, it is necessary to have a series of census counts as set forth in [the AKFC Policy and Procedure]. Thus

> patients are kept in their rooms briefly at various times during the day for count, during which times they are often visited by clinical staff."

Def. Mot. for Summary Judgment, Main Certification, ¶¶ 4, 7.  With regard to the overnight procedures, i.e., the patient/room checks, Defendant Main certified that "following the 9:00pm evening count, patients are locked in their rooms until the morning count for the safety of patients and staff."  Id. at ¶ 7.  Lastly, Defendant Main certified that these procedures have "always been in existence" since AKFC began operations.  Id. at ¶ 8.

In addition to the foregoing, Plaintiff also points to a portion of the AKFC Policy and Procedure entitled "Major Disturbance," which pertains to "the responsibility of medical staff during . . . a violent episode caused by a [sic] 2 or more patients acting together."  Pl. Mot. for Summary Judgment, Ex. at AKFC 9.  This procedure specifically calls for medical security officers to "lock all exits and entrances to the area where the disturbance is located" and to "direct patient [sic] to their rooms and close (lock) their room doors behind them."  Id. at 9-10. Furthermore, "[t]his procedure may only be implemented on a temporary and emergency basis and only when serious/potentially serious safety and security risks are at stake."  Id.

Before proceeding to the merits of the parties' claims, I address Defendants' argument that Plaintiff's wrongful isolation claim is barred by a previous settlement.  Specifically, Defendants contend that a settlement agreement executed by Plaintiff in a previous matter, see Brandt v. Ganey, No. 3:06-cv-5639-FLW, 2008 WL 5416393 (D.N.J. Dec. 22, 2008) (the "Ganey Action"), attached as an exhibit to the certification of counsel for Defendants, D.A.G. David L. DaCosta (the "Settlement Agreement"), bars Plaintiff's wrongful isolation claim in this action.  Defendants point to the following language in the Settlement Agreement, which provides that Plaintiff agreed to release

> the State of New Jersey and its Departments, Divisions, Commissions, Officials, and their insurers, agents, employees . . . from all claims . . . which have been, could have been or might have been made or prosecuted, on account of any conduct of any party occurring at any time with respect to the events, information and disputes giving rise to these actions . . . .

Settlement Agreement, ¶ 4.  Defendants argue that this release bars Plaintiff's wrongful isolation claim in this action because (1) the claim here relates to Plaintiff's placement at AKFC, and (2) the same policies that Plaintiff complains of in this action were in effect at AKFC at the time of the <u>Ganey</u> Action.  In other words, Defendants contend that Plaintiff's instant wrongful isolation claim based on the policies of AKFC is a "claim . . . which could have been or might have been made . . . on account of any conduct of" Defendants.  Def. Mot. for Summary Judgment, 19-20.  Plaintiff opposes Defendants' argument on the basis that the defendants, events, times and claims covered by the Settlement Agreement are different than those in the instant matter.

Under New Jersey law,[16] where the terms of a contract, including a settlement agreement, are clear, a court "must enforce the unambiguous terms as written, and it has 'no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument.'"  <u>Sluka v. Landau Uniforms, Inc.</u>, 383 F. Supp. 2d 649, 655 (D.N.J. 2005) (quoting <u>E. Brunswick Sewerage Auth. v. E. Mill Assocs.</u>, 365 N.J. Super. 120, 838 A.2d 494, 497 (N.J. App. Div. 2004)).  Initially, then, it would appear that, given the broad scope of the terms of the release and the clear and unambiguous language employed in the Settlement Agreement, Plaintiff's wrongful isolation claim in this action might indeed barred.  <u>See</u> <u>Cooper v. Borough of Wenonah</u>, 977 F. Supp. 305, 311-15 (D.N.J. 1997) (explaining that a signed release – even a broad, general one – should be given considerable weight).

---

[16]     "State law governs the construction and enforcement of settlement agreements in federal court."  <u>Excelsior Ins. Co. v. Pennsbury Pain Ctr.</u>, 975 F. Supp. 342, 348-49 (D.N.J. 1996).

Defendants' argument, however, ignores another, separate, provision of the Settlement Agreement providing that "[t]his Settlement Agreement and the actions taken hereunder <u>shall not constitute a precedent in this case or any other claim or matter, present or future</u>."  Settlement Agreement, ¶ 9 (emphasis added).  Reading this provision in conjunction with the earlier cited language – that Plaintiff agreed to release only his claims based on the "conduct of any party occurring at any time with respect to the events, information and disputes giving rise to these actions" – I conclude that Plaintiff's wrongful isolation claim in the instant matter does not come within the scope of the Settlement Agreement.  When read as a whole, the Settlement Agreement plainly is limited to the events and claims in the <u>Ganey</u> Action; it is clear from the unambiguous language in Paragraph 9 that the parties did not intend the Settlement Agreement to bar Plaintiff from bringing future claims arising out of his placement at AKFC.  Thus, because the conduct that Plaintiff complains of in this case is separate and apart from the issues raised in the <u>Ganey</u> Action – indeed, the claims in this case did not arise until more than a year after Plaintiff signed the Settlement Agreement – Plaintiff is not barred from bringing his wrongful isolation claim.  I turn now to the merits of his claim.

Plaintiff alleges that his isolation in his room is not the product of professional judgment; accordingly, I analyze Plaintiff's claim under the <u>Youngberg</u> balancing test.[17]  <u>See Youngberg v. Romeo</u>, 457 U.S. 307 (1982); <u>see also Scott v. Plante</u> 691 F.2d 634, 638 (1982) (explaining that in the case of an alleged violation of the right to be free from bodily restraint, a plaintiff can show "that the restraint was more than a reasonable professional judgment found necessary for

---

[17]     Plaintiff does not argue that his isolation is retaliatory or retributive, only that it is arbitrary; thus <u>Youngberg</u> is the appropriate starting point for my analysis.  <u>See Scott v. Plante</u> 691 F.2d 634, 637 (1982) ("So long as . . . the conditions [of confinement] imposed were not punitive in nature or purpose, reasonableness of nonpunitive conditions rests on whether the decision to subject the patient to such conditions was made by a professional competent in the relevant discipline.").

safety or treatment"). In <u>Youngberg</u>, the Supreme Court held that civilly-committed mental patients retain substantive liberty interests in adequate food, shelter, clothing, and medical care, <u>id.</u> at 315, as well as in safety, freedom of movement, minimally adequate or reasonable training to ensure safety, and freedom from undue restraint. <u>Id.</u> at 317-19. These interests, however, are not absolute. <u>Id.</u> at 319-20. "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" <u>Id.</u> at 320 (quoting <u>Poe v. Ullman</u>, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). In seeking this balance, a court must weigh "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." <u>Id.</u> In that regard "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." 487 U.S. at 321 (quoting <u>Youngberg v. Romeo</u>, 644 F.2d 147, 178 (3d Cir. 1980) (Seitz, C.J., concurring)). Thus, "courts must show deference to the judgment exercised by a qualified professional." <u>Id.</u> at 322. In sum, in order to avoid excessive judicial interference with the internal operations of institutions such as AKFC, decisions rendered by a professional state actor are "presumptively valid," and will be found to have violated a plaintiff's rights "only when the decision . . . is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." <u>Youngberg</u>, 457 U.S. at 323.

Here, Plaintiff argues that Defendants' decision to confine Plaintiff to his room for certain portions of the day and overnight – and, specifically, to lock him in his room during this confinement – is not based on any policy and procedures in place at AKFC, and thus is "such a substantial departure from accepted professional judgment, practice, or standards as to

demonstrate that the person responsible actually did not base the decision on such a judgment."
Id.; see also N.J.S.A. 30:4–24.2(e)(2) (providing that involuntarily-committed mental patients
have a right to be committed "to the least restrictive conditions necessary to achieve the purposes
of the treatment"). Defendants respond that these security measures are justified for the reasons
set forth in the AKFC Policy and Procedure and Defendant Main's certification, both of which,
Defendants argue, are the products of reasoned professional judgment. However, Defendants'
argument does not address one of Plaintiff's central contentions: whether the decision to lock
Plaintiff in his room is based on a professional judgment, policy, standard or practice. Nothing
in the AKFC Policy and Procedure relating to the census counts provides that AKFC patients
must be "locked" in their rooms. Instead, the policy only states that patients must be "in" their
rooms for the census counts. See, e.g., Pl. Mot. for Summary Judgment, Ex. at AKFC 3 (for
written counts, "all patients are to be in their rooms unless otherwise cleared" (emphasis added)).
Moreover, Defendants give no explanation as to why AKFC patients are required to be locked in
their rooms, and thus do not address the significance of Plaintiff's distinction between being
placed in his room and being locked in it. Furthermore, Defendants fail to clarify, in light of
Plaintiff's factual allegations, whether patients are indeed locked in their rooms during the
daytime written counts, or overnight only; Defendant Main merely certified – with reference to
the AKFC Policy and Procedure, but without further explanation – that "patients are kept in their
rooms briefly at various times during the day for count" and "are locked in their rooms"
overnight. Def. Mot. for Summary Judgment, Main Certification, ¶ 7. As already noted,
however, the AKFC Policy and Procedure does not explicitly provide for rooms to be locked
during the daytime written counts or overnight. Rather, as Plaintiff points out, lockdowns are
only clearly and specifically identified as a proper security measure in the "Major Disturbance"

portion of the AKFC Policy and Procedure.  Pl. Mot. for Summary Judgment, Ex. at AKFC 9-10.

Defendants' failure to rebut Plaintiff's allegation that he is locked in his room during daytime hours – and their concession that Plaintiff is locked in his room overnight – coupled with their failure to provide an explanation for the policy of locking patients in their rooms during census counts precludes granting summary judgment to Defendants as to the wrongful isolation count of the Complaint.  At the same time, Plaintiff has failed to demonstrate that the decision to lock patients in their rooms during the census counts is not the product of professional judgment, such that it can be deemed a constitutional harm under Youngberg.  The record simply is not adequately developed on this issue, which is material to resolving Plaintiff's wrongful confinement claim.  Accordingly, I conclude that summary judgment is inappropriate at this stage for either party, and both parties motions are denied without prejudice.

### B.  Inadequate Treatment Claim

Plaintiff also alleges that his due process rights have been violated because Defendants provided him with constitutionally inadequate medical treatment.   The primary thrust of Plaintiff's claim is that Defendants, through the treatment team, do not spend enough time treating him and do not tailor the treatment he is provided to his specific condition.  Defendants, however, contend that the treatment is adequate.   Defendants support their claim with expert/factual evidence from named Defendants herein, and point out that Plaintiff has proffered no evidence of his own to demonstrate that his treatment is inadequate under accepted standards and practices or professional judgment.

As already noted, civilly-committed mental patients retain certain liberty interests, including the right to adequate medical treatment.  See Youngberg v. Romeo, 457 U.S. at 315. As with Plaintiff's wrongful isolation claim, Plaintiff's treatment by a qualified professional is

presumptively valid and constitutional; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.  Id. at 323  In that connection, expert testimony is highly relevant to determining both the accepted professional judgment, practice, or standards as well as the departure, if any, therefrom.  See id. at 323 n.31; cf. Montgomery v. Pinchak, 294 F.3d 492, 504 (3d Cir. 2002) ("This Court has recognized the need for expert testimony in proving a claim based on medical injury.").  Relevant to Plaintiff's claim regarding adequate treatment, the Court must determine, in light of the evidence presented on this summary judgment motion, whether Plaintiff's treatment was the result of the exercise of professional judgment by qualified professionals, and, if so, whether that judgment so significantly departed from the appropriate standards that it violated Plaintiff's due process rights.

Defendants, in support of their motion for summary judgment as to Plaintiff's adequate treatment claim, have provided several declarations from members of Defendant's treatment team.  First, Defendant Elizabeth Hogan (hereinafter, "Dr. Hogan"), the Chief of Psychiatry at AKFC, submitted a comprehensive certification regarding Plaintiff's treatment,[18] in which she explained the type and nature of Plaintiff's primary medical conditions: bipolar disorder and antisocial personality disorder.  See Def. Mot. for Summary Judgment, Hogan Cert., ¶¶ 7-8. With respect to bipolar disorder, Dr. Hogan certified that the standard of care for treatment of such a disorder includes medication and education.  Id. at ¶ 7.  In Plaintiff's case, Dr. Hogan certified that Plaintiff is prescribed an antipsychotic medication, indicated as a mood stabilizer to

---

[18]     Dr. Hogan reviewed Plaintiff's medical records, as well as the FAC, and spoke to his treatment team prior to submitting her declaration.  Def. Mot. for Summary Judgment, Hogan Cert., ¶ 2.

treat bipolar disorder as well as impulsivity and aggression.  Id.  Dr. Hogan then explained that Plaintiff also receives the educational component of treatment for bipolar disorder, which includes his participation in daily group activities and assigned rehab programs.  Id.  With respect to his antisocial personality disorder, Dr. Hogan certified that there is no treatment per se for this disorder, which she explained is "an ingrained part of [Plaintiff's] personality structure." Id. at ¶ 8.  Dr. Hogan further certified that Plaintiff's personality disorder is linked to his bipolar disorder, in that each disorder complicates the treatment of the other.  Id.  Dr. Hogan also stated in her certification that Plaintiff's antisocial behavior is likely to decrease with age, and thus she expects that Plaintiff's personality disorder will be less of a factor as time progresses.  Id.

Regarding treatment generally, Dr. Hogan certified that as part of Plaintiff's treatment regimen, Plaintiff meets with the treatment team on weekly rounds and other regularly scheduled treatment team meetings, as well as on incident-specific instances as needed.  Id. at ¶ 9. Furthermore, Dr. Hogan explained in her certification that Plaintiff also attends daily "off-unit rehabilitation programs," at which he is assessed and assigned an individual rehabilitation program, with the Rehabilitation staff from these programs also meeting with the treatment team on a weekly basis to review treatment goals and progress.  Id.  In sum, Dr. Hogan certified that, based upon her review of Plaintiff's medical records and her conversations with the treatment team, it is her opinion to a reasonable degree of medical certainty that Plaintiff's treatment at AKFC is well within the standard of care for treating Plaintiff.[19]  Id. at ¶ 12.

Defendant Susikala Pasupuleti (hereinafter, "Dr. Pasupuleti") also submitted a

---

[19]      In that connection, I note that Dr. Hogan also certified that Plaintiff was able to make sufficient progress in his treatment such that he was discharged from AKFC to a less restrictive setting on several occasions.  Id. at ¶ 11; see also supra Footnote 3.

certification in her capacity as Medical Director of AKFC,[20] in which she certified that it is her opinion that the treatment provided to Plaintiff is "well within the standard of care for treating patients with his conditions."  Def. Mot. for Summary Judgment, Pasupuleti Cert., ¶ 6. Dr. Pasupuleti further certified that she concurred with Dr. Hogan's "diagnoses, opinions and conclusions relating to the treatment and care of [Plaintiff]."  Pasupuleti Cert., ¶ 5

In contrast, Plaintiff has submitted no certifications, expert reports, or other documents as evidence in opposition to Defendants' motion for summary judgment.[21]   Rather, Plaintiff opposes summary judgment by arguing that there is a dispute over the quantity of treatment he receives.[22]  Specifically, Plaintiff argues that he has raised a genuine issue of material fact by alleging that he only sees the treatment team for approximately six minutes a month, which fact

---

[20]     Dr. Pasupuleti explained that her duties as Medical Director include "oversight and supervision of the psychiatric and medical staff at AKFC to ensure that patients receive appropriate [treatment] . . . ."  Def. Mot. for Summary Judgment, Pasupuleti Cert., ¶ 1.  She further explained that, as Medical Director, she "review[s] and authorize[s] the treatment team's recommendation" regarding Plaintiff's treatment.  Id. at ¶ 3.  In preparing her certification, Dr. Pasupuleti reviewed the FAC, Plaintiff's medical chart, and Dr. Hogan's own certification, as well as spoke with the treatment team, including Dr. Hogan.

[21]     However, in both his July 2, 2012, and March 13, 2013, applications for appointment of pro bono counsel, Plaintiff stated that he needed counsel because "[t]his case requires expert witnesses regarding the professional standards and treatment requirements."  See Pl. App. for Pro Bono Counsel, July 2, 2012, at 3.  Further, in response to Defendants' request for admission on the inadequate treatment claim, Plaintiff acknowledged that the claim "[r]equires expert testimony."  See Def. Mot. for Summary Judgment, Cert. of David L. DaCosta, D.A.G., Ex. A, 14.  As discussed infra, Plaintiff has been unable to obtain an expert opinion due to his status as a civilly-committed patient proceeding pro se, although the Court now determines that he should be appointed pro bono counsel.  See Part III.C, infra.  Indeed, this provides further support for denying Defendants' summary judgment motion as to Plaintiff's inadequate treatment claim, in order to provide Plaintiff's counsel the opportunity to determine whether to obtain expert testimony in the matter.

[22]     Plaintiff also claims that he has not been able to complete the discovery related to his inadequate treatment claim, and thus summary judgment is inappropriate.  I address this argument infra with respect to Plaintiff's application for pro bono counsel.

precludes granting summary judgment to Defendants.[23]

Defendants oppose Plaintiff's argument by relying on his AKFC medical records, submitted with their summary judgment motion.[24]  According to Defendants, these records show that Plaintiff's treatment team is scheduled to meet with Plaintiff several times a week, ranging from three to five days, for purposes of reviewing his treatment plan, including ensuring that Plaintiff is taking his medication.  For example, on March 19, 2010, in a report titled "Ann Klein Forensic Center 14 Day Treatment Plan," one of the listed "Short-Term Objectives/Therapeutic Interventions" is "Confront denial of responsibility for the impulsive behavior or the negative consequences," which was scheduled to occur for the duration of the treatment plan at 11:00am on Monday, Tuesday and Friday each week in a meeting between Plaintiff and the treatment team.  See Hogan Cert., Brandt Records, at AKFC 25-26.  In that connection, the "team note" attached to this same 14 Day Treatment Plan contains handwritten notes apparently relating to conversations between a member of the treatment team and Plaintiff.  See id. at AKFC 28.  Also included in this portion of Plaintiff's medical records is a paper dated March 19, 2010, titled "Treatment Plan Signature Sheet," which contains Plaintiff's signature, indicating that the treatment plan had been discussed with him by members of the treatment team, whose signatures also appear on the sheet.  Id. at AKFC 33.  This 14 day Treatment Plan is but one of many; Plaintiff's records contain similar reports, including 30 day and 60 day treatment plans, spanning

---

[23]     In support of this argument, Plaintiff relies on the cases of Scott v. Plante, 641 F.2d 117 (3d Cir. 1981), and Cabrales v. Cnty. of Los Angeles, 864 F.2d 1454, 1461 (9th Cir. 1988), both of which were vacated on appeal by the Supreme Court, apparently for the proposition that inadequate treatment can be established by showing that health staff spent only a few minutes a month treating a committed patient.  To the extent that Plaintiff is arguing that his inadequate treatment claim should prevail as a matter of law, even a cursory review of these cases, and their subsequent appellate history, demonstrates that they do not support this position.

[24]     These records are attached to Dr. Hogan's certification submitted with Defendants' motion for summary judgment.

the time period covered by the Complaint.  E.g., id. at AKFC 34 (June 8, 2010); id. at AKFC 49 (August 3, 2010).  Indeed, beginning in April 2011, if not earlier, the treatment plans were revised so as to increase the frequency of Plaintiff's scheduled meetings with the treatment team to five days a week.[25]

Significantly, Defendants have not submitted any evidence, certifications, or other documentation to rebut Plaintiff's claim regarding the minimal amount of time that the treatment team actuals spends with Plaintiff.  In that connection, while Plaintiffs' medical records provide some indication that Plaintiff has met with the treatment team during unit rounds and in certain other scheduled meetings, see id. at AKFC 72, 78, these records do not show how much time the treatment team spent with him or, apart from the occasional signature sheet, whether the treatment team actually met with him at all.  The only fact that the medical records and Dr. Hogan's certification conclusively demonstrate is that the treatment team created several treatment plans for Plaintiff; the record is silent as to the quantity of time that Plaintiff spent with the treatment team.

In sum, Defendants have failed to show that there is no genuine dispute as to the material fact regarding the quantity of treatment Plaintiff receives at AKFC.  Because the quantity of time that the treatment team spends with Plaintiff goes to the heart of Plaintiff's claim that he is

---

[25]     Plaintiff's AKFC medical records further indicate that Plaintiff regularly attended rehabilitation, or "rehab," programs for several hours a day.  See id. at AKFC 31, 36, 50, 54, 73, 87.  Defendants, through Dr. Hogan, claim that these rehab problems constitute an appropriate part of Plaintiff's treatment regimen under the applicable standard of care.  Plaintiff, however, argues that the rehab programs are not acceptable treatment for his condition, and thus should not be considered in determining the quantity and quality of treatment that Plaintiff is provided.  Plaintiff's contention is based purely on his own allegations, as he has not submitted any expert opinion or similar evidence attesting to the proper standard of care for his condition.  Because I conclude that Defendants' motion for summary judgment fails for other reasons, and because, as discussed infra, Plaintiff has been unable to retain any experts due to his status as a pro se, civilly-committed, litigant proceeding in forma pauperis, I do not decide whether the rehab programs are properly considered adequate treatment of Plaintiff's condition.

receiving inadequate treatment, I cannot conclude, based on the record before me, whether the evidence submitted by Defendants demonstrates that Plaintiff's claim is meritless.   In other words, Defendants have not shown that Plaintiff is actually receiving treatment by qualified medical personnel.   See Youngberg, 457 U .S. at 323.   In that connection, as discussed infra, because the Court now determines that Plaintiff should be appointed counsel – who in turn may decide to retain one or more experts on the issue of treatment – summary judgment at this stage would deny Plaintiff the opportunity to adequately present his claims.[26]   Accordingly, Defendants' motion with respect to Plaintiff's inadequate treatment claim is denied without prejudice.

### C.  Appointment of Pro Bono Counsel

Plaintiff also has filed an application for appointment of pro bono counsel.   In his application, Plaintiff claims that he requires appointment of counsel because he is (1) indigent, (2) unable to prosecute his case given his current clinical state, (3) unable to proceed effectively in discovery, and (4) incapable of understanding the legal issues in this case given his mental status and condition.   See Pl. App. for Pro Bono Counsel, Mar. 13, 2013, Dkt. No. 42 at 3.   In that regard, I note that Plaintiff previously had filed an application for appointment of counsel on July 2, 2012.   In that application, Plaintiff, in addition to including similar justifications for appointing counsel, claimed that "[t]his case requires expert witnesses regarding the professional standards and treatment requirements."   Pl. App. for Pro Bono Counsel, July 2, 2012, Dkt. No. 29 at 3.   On July 9, 2012, the Magistrate Judge denied Plaintiff's application, concluding, inter alia, that Plaintiff had not shown that his claims would require expert testimony or that denial of pro bono counsel would not likely result in a violation of Plaintiff's due process rights.   See Maj.

---

[26]      See also, supra, Footnotes 21-22.

Judge Decision of July 9, 2012, Dkt. No 30 at 3.  Upon further consideration, and in light of the parties' arguments in their summary judgment motions, I conclude that Plaintiff's application for appointment of <u>pro bono</u> counsel should be granted.

"Where an unrepresented [p]laintiff in a civil suit is indigent, and where good cause exists for the appointment of <u>pro bono</u> counsel under 28 U.S.C. § 1915(e)(1), the District Court has the discretion and authority to appoint pro bono counsel . . . ."  <u>Williams v. Hayman</u>, 488 F. Supp. 2d 446, 447 (D.N.J. 2007).  The District Court should exercise this discretion when the interests of justice require the appointment of counsel to assist Plaintiff in the prosecution of this case, which may occur at any point during the case.  See <u>Tabron v. Grace</u>, 6 F.3d 147, 156 (3d Cir. 1993) ("[W]e emphasize that appointment of counsel under §1915(d) may be made at any point in the litigation . . . .").

In determining whether to appoint pro bono counsel, a court must consider the following factors set forth by the Third Circuit in <u>Tabron v. Grace</u>:

> (1) the claim has some merit;
> (2) the <u>pro se</u> party lacks the ability to present an effective case without an attorney;
> (3) the legal issues are complex or, the ultimate legal issues are not complex, but the <u>pro se</u> party lacks the familiarity with the rules of evidence and discovery needed to translate understanding of the law into presentation of the proofs;
> (4) factual investigation will be necessary and the party is not adequately able to pursue said investigation;
> (5) the case is likely to turn on credibility determinations;
> (6) the case will require expert testimony; and
> (7) the party is unable to attain and afford counsel on his/her own behalf.

<u>Lamas v. Gonzales</u>, No. 07-3351, 2007 WL 4166009, at *1 (D.N.J. Nov. 16, 2007) (citing <u>Parham v. Johnson</u>, 126 F.3d 454 (3d Cir.1997)).  A <u>pro se</u> litigant need not meet each of the <u>Tabron</u> factors for the Court to appoint counsel.

Applying the <u>Tabron</u> factors to the present case, the Court finds that the case has merit

given the dearth of evidence presented by Defendants to rebut Plaintiff's claims and the significance of the rights asserted by Plaintiff in his Complaint, that Plaintiff's ability to investigate his claims any further have been hampered by his commitment at AKFC and his frequent transfers to other facilities, that factual investigation, including treatment records, is necessary to resolve disputed issues of fact,[27] that Plaintiff is an indigent incapable of attaining counsel on his own behalf, and finally, pivotal issues in the case at bar turn on the need for expert testimony.[28]   Indeed, as indicated previously in this Opinion, Plaintiff has raised several challenges to Defendants' summary judgment motion that demonstrate the need for pro bono counsel under the Tabron factors.[29]   Given the need for further investigation, the importance of expert testimony in resolving Plaintiff's claims, and the determination that Plaintiff's claims may have merit, the Court finds it appropriate to appoint Plaintiff pro bono counsel at this stage in the litigation.  See Brandt v. Ganey, No. 3:06-cv-5639-FLW, 2008 WL 5416393, at *11 (D.N.J. Dec. 22, 2008) (finding appointment of pro bono counsel appropriate where plaintiff's case was strong, additional factual investigation was necessary, and credibility determinations would be

---

[27]    Specifically, the factual issues regarding the quantity of time Defendants spend providing Plaintiff with treatment and the nature of Plaintiff's confinement to his room during the daytime census counts require further factual investigation.

[28]    See Montgomery v. Pinchak, 294 F.3d 492, 505 (3d Cir. 2002) ("[W]e conclude that the Magistrate Judge clearly erred in his determination that medical expert testimony would be unnecessary in [plaintiff's deliberate indifference] case.  While . . . it still may be difficult for appointed counsel to obtain and afford an expert, we continue to believe that appointed counsel will have a much better opportunity to obtain an expert than would an indigent prisoner. . . . Consequently, we find that this factor weighs heavily in favor of the appointment of counsel." (Citation omitted; internal quotation marks omitted; emphasis added.)).  Pro bono counsel may, however, determine after further investigation that expert testimony is not sufficient or necessary to prove some of Plaintiff's claims.

[29]    For example, in opposing Defendants' summary judgment motion, Plaintiff argues that he has been "thwarted" from completing discovery.  Specifically, Plaintiff argues that that Defendants have the documentation necessary to show that Plaintiff's treatment is inadequate, and that Defendants did not provide Plaintiff the documents relied on in Defendants' motion for summary judgment prior to their motion being filed.  Regardless of whether these arguments are meritorious, they show Plaintiff's confusion over how to properly proceed with discovery.

required).

**VI. CONCLUSION**

For the reasons set forth above, this Court denies, without prejudice, Defendants' Motion

for Summary Judgment and Plaintiff's Cross-Motion for Partial Summary Judgment.  The Court

grants Plaintiff's application for appointment of <u>pro bono</u> counsel.  An appropriate order follows.


Date: April 18, 2012                                              /s/ Freda L. Wolfson_____
                                                                 Hon. Freda L. Wolfson, U.S.D.J.